**In re the DREXEL BURNHAM LAMBERT GROUP INC., Debtor.**

**Bankruptcy No. 90B–10421 (HCB).**

United States Bankruptcy Court, S.D. New York.

May 3, 1990.

832

Shearman & Sterling by Susan P. Johnston, George F. Wade, Laura B. Bartell, New York City, for Various Banks.

Weil, Gotshal & Manges by Corinne Ball, Richard Krasnow, Richard Davis, Pamela Corrie, New York City, for debtor.

Jones, Day, Reavis & Pogue by Marc S. Kirschner, Cindy Tzerman, New York City, for creditors committee.

## DECISION

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

Banque Worms and fifteen other banks [1] (the "Banks") seek pursuant to 11 U.S.C. § 362(d) and § 105(a) (1986), an order modifying the automatic stay provided in 11 U.S.C. § 362(a)(3) to permit Bankers Trust Company ("Bankers Trust"), as Collateral Agent, to retain in trust collateral proceeds owed to the Debtor, The Drexel Burnham Lambert Group, Inc. ("Drexel"), to preserve their alleged right to set off Drexel's

---

1. Banco de Ponce; Banco Portugues do Atlantico; Bank of Scotland; Banque Internationale a Luxembourg SA; French American Banking Corporation; Barclays Bank PLC, New York Branch; Bayerische Vereinsbank AG (Union Bank of Bavaria), New York Branch/Cayman Islands Branch; Cassa di Risparmio di Torino, New York Branch/Cayman Islands Branch; Citibank, N.A.; Credit Agricole—CNCA, Cayman Islands Branch; James Capel Bankers Ltd.; Kansallis–Osake–Pankki; Landesbank Rheinland–Pfalz International, S.A., Cayman Islands Branch; and PRIVATbanken A/S.

obligations to them as against Drexel's share of those proceeds if they are not paid in full. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G) (1984).

I

Drexel filed a petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on February 13, 1990. Prior to bankruptcy, it had entered into an Amended and Restated Credit Agreement (the "Credit Agreement") as of October 30, 1986 with some twenty-six (26) lenders (the "Lenders"), including the movants, providing for a credit commitment of $245,000,-000 initially and $260,000,000 ultimately to First DBL Corporation ("First DBL"), a wholly owned subsidiary of the Debtor.

First DBL, on June 25, 1987, entered into a pledge agreement (the "Pledge Agreement") with Bankers Trust for the benefit of the parties to the Credit Agreement.[2] Pursuant to the Pledge Agreement, each of the Lenders made advances to enable First DBL to obtain 20% of the common stock and 100% of the preferred stock of PT Corporation. The Lenders obtained, as collateral for the advances, the PT stock, Drexel's commitment to make certain additional equity investments, made or to be made by Drexel as required by the Credit Agreement, and the proceeds of both the PT stock and the additional investments. Pledge Agreement § 4.1. PT Corporation was apparently structured as an investment vehicle that could, *inter alia,* own or perhaps trade in securities. *See* Credit Agreement § 6.01(h), § 1.01 at 16–17 (definition of "Portfolio Securities"). Its assets currently consist primarily of junk bonds, the market for which is unstable. Duke Aff. ¶ 7.

Drexel, "as primary obligor and not merely as surety," unconditionally guaranteed all obligations of First DBL to the Lenders under the Credit Agreement and Pledge Agreement. Credit Agreement § 3.01. It further agreed to make additional equity investments in First DBL if the market value of its portfolio securities or the PT stock fell below 110% of the outstanding loans. Credit Agreement § 6.01(h). In such instances, Drexel was obligated to make additional investments in an amount not less than the difference between 117.5% of the amount of the outstanding loans and market value. *Id.*

The Lenders' loan commitments, although contained in a joint agreement, consisted of their agreement to lend individually designated amounts to First DBL. Credit Agreement §§ 2.01, 2.02, 1.01 (definition of "Advance" refers to an advance "by a Bank"). First DBL's obligation to repay principal and to pay interest ran directly to each Lender. *Id.* §§ 2.05, 2.06. The possibility that the Lenders might charge different interest rates, depending on eurodollar fluctuations, was contemplated. *Id.* §§ 2.02(b), 2.07, 2.08, 1.01 (definition of "Interest Rate"). First DBL's repayment obligation for the advance by each Lender was to be evidenced by a promissory note payable to that Lender rather than to the Lenders generally. *Id.* §§ 4.01(a), 1.01 (definition of "Note"). Thus, the Credit Agreement contemplates that each Lender be a direct creditor of First DBL and Drexel in the amount of its outstanding advance. *See also id.* § 2.13.

At some point in 1988, certain Lenders assigned to Drexel the promissory notes issued to them pursuant to the Credit Agreement. Parsons Aff. ¶ 9. Those assignments entitled Drexel to all the rights and benefits its assignors enjoyed under the Credit Agreement and the Pledge Agreement. Duke Aff. ¶ 6. Thus, Drexel is both obligor and, now, as a member of the group ("Group Members"), obligee. The Banks have claims against Drexel as obligor, to the extent that the collateral is insufficient to repay them; conversely, Drexel, as a Group Member, is owed $11,-375,000 by First DBL, *id.,* and has rights to its share of the collateral securing all of the advances made.

---

**2.** Throughout the Banks' papers, it is assumed that the Credit Agreement and Pledge Agreement are to be construed together.

Bankers Trust is not a Lender. It was appointed as "Collateral Agent" under the Credit Agreement. Proceeds of the collateral are to be paid to it. It has the duty to liquidate the collateral and apply the proceeds, after payment of taxes, commissions, its own expenses and certain expenses of the Group Members, to payment of interest and principal ratably to each Group Member. *See* Pledge Agreement §§ 5.1, 5.4, 2.1. Chase Manhattan Bank N.A. ("Chase") has the same duties as Paying Agent under the Credit Agreement with respect to funds remitted to it for repayment to the Group Members. Credit Agreement §§ 8.01, 2.10.

Section 5.1 of the Pledge Agreement provides that, in the event of an acceleration under the Credit Agreement (as the Banks allege has happened here), "the Collateral Agent, for the benefit of the Participating Banks, the Collateral Agent, the Paying Agent and the Reference Agent may ... sell any or all of the Pledged Collateral ... and shall apply the proceeds thereof to the repayment of the Outstanding Obligations [of First DBL evidenced by notes held by Group Members]." Section 5.4 of the Pledge Agreement, in turn, provides that "[a]*ny amounts* which the Collateral Agent is entitled to receive and retain on account of or as a result of its rights hereunder *shall be applied by the Collateral Agent in the order of priority and in the proportions indicated in Section 2.1 hereof* until all Outstanding Obligations shall have been extinguished" (emphasis added). Section 2.1, referred to in section 5.4, establishes the order of payment of the various liabilities of First DBL under the Credit Agreement and the Pledge Agreement. It states in pertinent part:

This Agreement is made to provide for and secure repayment of the following indebtedness and liabilities of the Borrower ... in the order of priority indicated:

. . . .

*Fourth,* to the payment of interest at any time and from time to time owing by the Borrower ... *ratably according to the unpaid amounts thereof, without preference or priority of any kind among amounts of interest so due and payable;*

*Fifth,* to the payment of principal at any time and from time to time owing by the Borrower, ..., *ratably according to the unpaid amounts thereof, without preference or priority of any kind among amounts of principal so due and payable;* and

*Sixth,* except where otherwise provided herein, to the payment of all other indebtedness and liabilities, whether absolute, fixed or contingent, at any time and from time to time owing by the Borrower to the Participating Banks ..., *ratably according to the then unpaid amounts thereof, without preference or priority of any kind among such various Obligations.*

*Id.* § 2.1 (emphasis added).

Section 7.2 of the Pledge Agreement enables a majority of the Group Members to direct Bankers Trust in certain areas, *e.g.,* method and timing of the liquidation of collateral. In regard to these matters, the majority's instructions are binding. That section, nevertheless, keeps inviolate the right of each Group Member to ratable repayment by not requiring the Collateral Agent to follow any instruction contrary to the contract or applicable law. It states:

The Collateral Agent shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Majority Participating Banks, and such instructions shall be binding upon all Participating Banks and all holders of Notes; *provided, however,* that the *Collateral Agent shall not be required to take any action* which the Collateral Agent reasonably believes exposes the Collateral Agent to personal liability or *which is contrary to this Agreement or applicable law.*

*Id.* § 7.2 (emphasis added). In acting upon the instructions, the Collateral Agent is protected from suit by any of the Group

Members. Credit Agreement at § 9.03.[3]

In addition, section 3.06 of the Credit Agreement grants to each of the Group Members the right to set off as against Drexel's obligation any indebtedness of the particular Group Member to Drexel such as depository accounts maintained by Drexel. No provision is made for the Group Members to set off any collective obligations they may owe to Drexel or Drexel's ratable share of collateral proceeds to be realized and distributed by the Collateral Agent.

To preserve ratable recovery by each Group Member, however, section 2.13 of the Credit Agreement requires each Group Member to share with all other Group Members any payment obtained through setoff in excess of the ratable amount owing to it in light of payments received by all other Group Members. That section provides for such sharing by requiring the Group Member who has received an excess through setoff to purchase a participation from each of the other Group Members in proportional amounts equalling the amount of the excess.[4] Section 2.13 contains certain exceptions to the sharing requirement which relate, *inter alia*, to incurred costs and taxes of a Group Member and payments made pursuant to a pledge agreement.

The Banks do not contend that this provision is inapplicable to the setoff they ultimately seek. The only possibly relevant exception is that referring to excess distri-

butions pursuant to a pledge agreement. That exception is apparently designed to accommodate the different interest rates that might apply and to recognize the expenses a Group Member might have that are allowed by section 2.1 of the Pledge Agreement. It does not appear to relate to a ratable share that is net of those expenses. Sections 5.4 and 2.1 of the Pledge Agreement permit only distribution of a ratable share. Hence, a setoff of a ratable share is not a distribution pursuant to the Pledge Agreement. It is in violation of the Pledge Agreement.

Drexel claims that Bankers Trust is holding over $2,000,000 that it has failed to distribute in accordance with the terms of the Credit and Pledge Agreements. Tr., p. 97.[5]

## II

The automatic stay imposed by section 362(a) of the Bankruptcy Code is "one of the most fundamental debtor protections provided by the bankruptcy laws." *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection*, 474 U.S. 494, 503, 106 S.Ct. 755, 761, 88 L.Ed.2d 859, 867 (1986) (*quoting* H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 54 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5840, 5963, 6296).

**3.** Section 9.03 of the Credit Agreement, in barring suit, appears technically to refer only to the original Lenders. It states "No Bank shall have any cause of action...." The term "Bank" is defined on page 1 of the Pledge Agreement to refer to the subscribing banks. Section 9.03, unlike § 7.2 of the Pledge Agreement, does not refer to noteholders such as Drexel. The Banks, however, construe this clause to bar suit by Drexel. Banks' Supp.Br., pp. 10–11.

**4.** Like § 9.03 of the Credit Agreement, *see* n. 3 *supra*, § 2.13 refers only to a "Bank," requiring sharing of an excess received over its ratable share "if any Bank shall obtain any payment ... through the exercise of any right of set-off in accordance with Sections 3.06 ... or otherwise ..." and requiring "such Bank [to] forthwith purchase from the other Banks such participation in the Advances made by them as part of such Borrowing as shall be necessary to cause

such purchasing Bank to share the excess payment ratably with each of them." Because the Banks assert that § 9.03, employing the same term "Banks," applies to Drexel, *see* n. 3 *supra*, it consistently follows that the same term employed in § 2.13 is also to apply to Drexel.

Such a construction accords with common sense. It is inconceivable that the original Lenders would have required sharing of any excess received only by themselves and not by any purchaser of notes. It is equally inconceivable that they would have greatly limited their ability to assign the notes they received by excluding assignees from the benefits of this provision. Indeed, the Banks' position is that Drexel has succeeded to all of the rights of its assignors. Duke Aff. ¶ 6. Thus, this section is to be so construed.

**5.** References to "Tr." are to the transcript of the hearing held on March 16, 1990.

■ Aware of the possible harm that the stay may cause to creditors of the estate, Congress provided, in section 362(d) of the Bankruptcy Code, for relief from the automatic stay:

(1) for cause, including the lack of adequate protection of an interest in property of [the movant] ...; or

(2) with respect to a stay of an act against property ..., if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

The Banks do not seek relief under section 362(d)(2). Rather, they attempt to establish "cause" under section 362(d)(1) on the ground that unless relief is granted their setoff rights will be lost. In so contending, they observe that the automatic stay, section 362(a)(7), bars setoffs, and that recent case law bars an administrative "freeze" of sums held by a creditor at the filing of a bankruptcy petition.[6] *See Small Business Admin. v. Rinehart*, 887 F.2d 165, 168, 19 Bankr.Ct.Dec. 1508, Bankr.L. Rep. (CCH) ¶ 73125 (8th Cir.1989); *United States v. Norton*, 717 F.2d 767, 773, 10 Bankr.Ct.Dec. 1337, Bankr.L.Rep. (CCH) ¶ 69367 (3d Cir.1983); *contra, e.g., In re Air Atlanta Inc.*, 74 B.R. 426, 427 (Bankr. N.D.Ga.), *aff'd*, 81 B.R. 724 (N.D.Ga.1987); *In re Williams*, 61 B.R. 567 (Bankr.N.D. Tex.1986); *see generally* Note, *Freeze and Recoupment: Methods for Circumventing the Automatic Stay?*, 5 Bankr.Dev.L.J. 85 (1987) [hereinafter cited as Note, *Freeze and Recoupment*].

Notwithstanding the Banks' proffered desire for relief adequate to protect setoff rights, they argue that they need not show, at this stage, that they have such rights. To them, section 362(d)(1) requires only that the property is not needed by the debtor, that granting the relief will not harm other creditors, and that modifying the stay will promote judicial economy. On these grounds, they ask the court to employ some undefined equity to allow them to direct Bankers Trust to set aside the sums held and to be received by it so that they can, at some later date, if the collateral is insufficient, seek a setoff by causing Drexel's share to be paid to them.

These arguments, however, amount to a request that the Court read the "cause" requirement of section 362(d)(1) out of the statute. The automatic stay is key to the collective and preservative nature of a bankruptcy proceeding. It protects debtors and creditors alike by barring unilateral creditor action and preserving estate property from creditor attack so that it may be distributed pursuant to a plan in Chapters 11, 12 and 13 or pursuant to the distributive scheme of Chapter 7. *See, e.g., Tringali v. Hathaway Mach. Co.*, 796 F.2d 553, 562, Bankr.L.Rep. (CCH) ¶ 71218 (1st Cir. 1986); *In re Prudential Lines, Inc.*, 107 B.R. 832, 842, 19 Bankr.Ct.Dec.1929, Bankr.L.Rep. (CCH) ¶ 73147 (Bankr.S.D.N. Y.1989). Consequently, cause, as set forth in section 362(d)(1), or lack of equity and lack of necessity, as set forth in section 362(d)(2), is required for the court to afford relief from its strictures. *See, e.g., In re Towner Petroleum Co.*, 48 B.R. 182, 190–91 (Bankr.W.D.Okla.1985); *In re Saypol*, 31 B.R. 796, 799, 10 Bankr.Ct.Dec. 1057, Bankr.L.Rep. (CCH) ¶ 69333 (Bankr.S.D.N. Y.1983).

The Banks' reliance on an alleged lack of need by the Debtor for the property derives from cases such as *Saypol*. In that case, the court considered whether property is necessary for an effective reorganization under section 362(d)(2) once it has been shown that the debtor lacks equity. *Saypol*, 31 B.R. at 803–04. The Banks, however, do not proceed under section 362(d)(2).

■ Similarly, their reliance on alleged lack of harm is drawn from such cases as *In re Colin, Hochstin Co.*, 41 B.R. 322, Bankr.L.Rep. (CCH) ¶ 69962 (Bankr.S.D.N.

---

**6.** Banks' Initial Brief, pp. 10–11. There the Banks accept the doctrine that they cannot freeze funds and appear to argue that, without relief enabling Bankers Trust to hold the funds due Drexel, their setoff rights will be lost. In their Reply Brief, p. 4 n. 2, the Banks reverse their field, arguing that they may be entitled to direct Bankers Trust to hold those funds without relief from the automatic stay. They repeat that argument in their Final Brief, p. 2.

Y.1984). In that case, the automatic stay was modified, a year after the bankruptcy petition was filed, to permit a New York Stock Exchange investigation since the debtor had its respite[7] and the investigation did not threaten dismemberment of estate property. *Id.* at 325–26. The companion concern for judicial economy stems from such cases as *Colin v. Manufacturers Hanover Trust Co. (In re Colin),* 35 B.R. 904, Bankr.L.Rep. (CCH) ¶ 69535 (Bankr.S.D.N.Y.1983) and *In re Texaco Inc.,* 81 B.R. 804 (Bankr.S.D.N.Y.1988). In *Colin* the court ruled that a pending state court action should be allowed to proceed in order to liquidate a claim against a trust res in which the debtor had only bare legal title.[8] 35 B.R. at 910. In a case involving a debtor who 1) had a similar respite, 2) had filed a plan providing for payment in full, and 3) sought to use the automatic stay as a sword, the court in *Texaco* modified the automatic stay to permit an indenture trustee to deliver a notice of acceleration not harming other creditors. 81 B.R. at 806.

These cases simply offer no support for the Banks' assertion that lack of need or harm and judicial economy constitute cause under section 362(d)(1). To so rule would deprive estates of funds and other property to which they are rightfully entitled[9] and permit dismemberment.

 Accordingly, the courts have uniformly ruled that cause under section 362(d)(1), requires the establishment of a legally sufficient basis for the action sought. *See e.g., In re Stranahan Gear Co.,* 67 B.R. 834, 837 (Bankr.E.D.Pa.1986) (collecting cases); *In re Compass Van & Storage Corp.,* 61 B.R. 230, 235–37 (Bankr. E.D.N.Y.1986) (stay would not be modified at the request of a landlord on the debtor's failure to pay rent where the debtor's partial eviction excused its failure to pay under state law). At the least, the movant's pleading must set forth and demonstrate that if the stay were modified, it would be entitled, under applicable law, to take the action it desires. Such a showing is implicit not only in section 362(d)'s requirement of a "request" but also in its requirement that a hearing be held if requested timely. *See* 11 U.S.C. §§ 362(d), 102(1). It would defy logic, for example, to modify the automatic stay to permit foreclosure of a lien for want of adequate protection under section 362(d)(1) if the movant did not adequately demonstrate that it had a lien and thereby an interest in property in need of adequate protection. Nor would it make

---

**7.** *See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Inc.,* 484 U.S. 365, 376, 108 S.Ct. 626, 632, 98 L.Ed.2d 740, 751 (1988).

**8.** The "cause" portion of § 362(d)(1) has also been utilized by bankruptcy courts to permit litigation in another forum:
 (i) if that litigation lacks any connection or interference with the bankruptcy case, *see* H.R.Rep. No. 595, 95th Cong., 1st Sess. 343–44 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 52–53 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5838–5839, 6300; or
 (ii) to liquidate a claim after the debtor has had a respite if:
 (a) the claim is a personal injury claim which the bankruptcy court lacks jurisdiction to liquidate, *see* 28 U.S.C. § 157(b)(2)(B), particularly if insurance covers the cost of defense and thereby the cost to the debtor is minimized;
 (b) the claim is the subject of an arbitration agreement, *Hays and Co. v. Merrill Lynch, Pierce Fenner & Smith, Inc.,* 885 F.2d 1149, 19 Bankr.Ct.Dec. 1344, Bankr.L.Rep. (CCH) ¶ 73091 (3d Cir.1989);
 (c) the claim is subject to the primary jurisdiction of another specialized court or agency. *See In re Prudential Lines, Inc.,* 69 B.R. 439, 448–49, 15 Bankr.Ct.Dec. 445, Bankr.L.Rep. (CCH) ¶ 71676 (Bankr.S.D.N.Y.1987); or
 (d) to do so would assist in the economic and efficient administration of the bankruptcy case. *See In re Towner Petroleum Co.,* 48 B.R. 182, 13 Bankr.Ct.Dec. 36, Bankr.L.Rep. (CCH) ¶ 70375 (Bankr.W.D.Okla.1985).
 In so doing, the bankruptcy courts, however, keep the stay of acts against estate property, § 362(a)(3), in place, thereby requiring the liquidated claim to be presented to the bankruptcy court in order to receive a distribution. *E.g., In re Turner,* 55 B.R. 498, 501–02 (Bankr.N.D.Ohio 1985).

**9.** It is presumptuous, moreover, for the Banks blithely to claim, without any discussion of Drexel's heavy administration expenses, that this debtor does not need cash. Even liquidating debtors-in-possession generally have payroll, rent, and other administrative expenses in addition to interim awards for professional fees.

any sense to modify the stay to permit another forum to liquidate a claim barred by the statute of limitations. It similarly makes no sense to modify the automatic stay to permit the movant to set off mutual debts if the movant fails to demonstrate that it enjoys the right. Once that is done, section 362(g) comes into play and allocates the burden of proof. *See Stranahan Gear,* 67 B.R. at 837; *see also,* 2 J. Lewittes, H. Miller, P. Murphy, J. Samet, W. Stern, *Collier on Bankruptcy* ¶ 362.10 at 362–72 (15th ed.1989).[10]

Nor can it be said that the requirement of demonstrating such cause puts a creditor in the dilemma of potentially losing the right of setoff, if any, through inaction. Any creditor so concerned should make its motion for section 362(d)(1) relief immediately after a debtor's bankruptcy petition is filed, requesting the interim relief of a freeze. Note, *Freeze and Recoupment, supra* at 108. If, at a preliminary hearing under section 362(e), there is a showing of entitlement to set off under applicable law and the likely loss of the right, that section permits continuance of the stay pending the conclusion of a final hearing only "if there is a reasonable likelihood that the party opposing relief from the stay will prevail...." 11 U.S.C. § 362(e). Permitting an entity to avoid paying a debt due a debtor, absent a showing of entitlement to set off its debt, however, only unjustly deprives the debtor and its estate of sums to be used in rehabilitation, *Rinehart,* 887 F.2d at 168; *Norton,* 717 F.2d at 774, or in paying current administrative costs incurred in liquidating its business.

Thus, we turn to the Banks' argument, developed in supplemental papers filed after the hearing, that they can set off the amounts owed by Drexel as against Drexel's ratable share of the collateral proceeds and thereby keep that share for themselves.

## III

The long established right to set off mutual pre-petition debts owed to and owed by a creditor in the same capacity has its roots in the recognition that setoff is but another form of secured financing to be recognized in bankruptcy. *In re Elcona Homes Corp.,* 863 F.2d 483, 485, 486, Bankr.L.Rep. (CCH) ¶ 72532 (7th Cir.1988). "[I]t is a provision based on the generally recognized right of mutual debtors which has been enacted as part of the Bankruptcy [laws], and when relied upon should be enforced by the court." *Cumberland Glass Mfg. Co. v. DeWitt,* 237 U.S. 447, 455, 35 S.Ct. 636, 639, 59 L.Ed. 1042 (1915). Section 553(a) of the Bankruptcy Code provides that generally:

> this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the [bankruptcy] case ... against a claim of such creditor against the debtor that arose before the commencement of the case....

11 U.S.C. § 553(a) (1979).[11]

Thus, section 553 does not create a right of setoff; the right exists, if at all, under applicable nonbankruptcy law. *See, e.g., In re McLean Indus., Inc.,* 90 B.R. 614, 618 (Bankr.S.D.N.Y.1988). But the right is limited by section 553(a) to pre-petition claims of creditors which are not disallowed and are mutual with their pre-petition debts owing to the debtor.

In their two supplemental briefs, the Banks assert that the setoff they seek lies under New York statutory and common

---

**10.** Section 362(g) itself requires the Banks to demonstrate their alleged ability to set off. *See* 11 U.S.C. § 362(g). It places on the shoulders of a movant for relief from the automatic stay the burden of proof with regard to a debtor's lack of equity. This requirement generally applies to secured creditors. Under § 506(a), a creditor having a valid right of setoff is treated as a secured creditor. Thus, it follows that a movant seeking relief to preserve setoff rights must show a lack of equity through the existence of the right.

**11.** There are exceptions. Among them is that setoff is barred if "the debt owed to the debtor by such creditor was incurred by such creditor" for the purpose of obtaining a right of setoff after 90 days before the bankruptcy petition was filed if the debtor was insolvent. 11 U.S.C. § 553(a)(3). Insolvency is presumed. 11 U.S.C. § 553(c).

law. They further assert that the requirements of section 553(a) are satisfied because, according to them, they, under the Credit and Pledge Agreements, (i) have pre-petition claims against Drexel as obligor for the amounts owed each of them and for the additional equity investment Drexel is obligated to make and (ii) owe Drexel, as Group Member, its ratable share of the collateral proceeds, which claims and debts are mutual. They also argue that, if they gave the Collateral Agent an instruction to withhold Drexel's ratable share, Drexel would have a claim against them, apparently for breach of fiduciary duty, *see* Banks' Supp.Br., p. 14 n. 8, which could be set off against the Banks' claim. The assertion that the Banks owe Drexel its ratable share, however, fails to withstand analysis of these agreements. Further, modification of the automatic stay to create post-petition an alleged mutual debt upon which setoff may be predicated should not be permitted.

### A

■ In urging that they can set off Drexel's obligation [12] against Drexel's share, as Group Member, of the proceeds of the collateral, the Banks attempt to create mutuality by saying that Drexel's share is a debt owed by them as a majority of the Group Members to Drexel and can be set off by them. This argument stands the Credit Agreement and the Pledge Agreement on their heads.

■ Briefly put, Drexel is indebted to each of the Group Members, including itself, as noteholder and assignee of the advances of some of the Lenders. The arrangement contemplated payment by First DBL to Chase as Paying Agent or realization by Bankers Trust as Collateral Agent upon the collateral, including Drexel's obligation to make additional investments, depending on the market value of the collateral. Chase and Bankers Trust were to distribute to each Group Member its ratable share. The Banks are not indebted to Drexel. Hence, there is no claim by them against Drexel to offset.

To this simple construct, the Banks respond that it is they, not the Collateral Agent, who are responsible for distributing to Drexel its ratable share of the proceeds of the collateral. They reach that conclusion by arguing in their briefs that they, as a majority of the Group Members, can instruct the Collateral Agent not to pay Drexel and therefore the responsibility to distribute the pro rata shares is theirs.

Noteworthily missing from this record, however, is any affidavited assertion by a representative of the Banks that it was at all contemplated that a majority of the Group Members could, through so instructing Bankers Trust as Collateral Agent, deprive a Group Member of its ratable share of the proceeds of the collateral. Fletcher Duke, vice president of Banque Worms, confirms that Drexel as assignee is entitled to all the rights and benefits of its assignors who were Lenders. Duke Aff. ¶ 6. Yet he fails to state that the majority could deprive Banque Worms, or any of the other Lenders or their assignees, of its ratable share. The palpable reason for that failure lies in the notion that such an ability to deprive a Group Member was never contemplated for it is highly unlikely that any Lender would have advanced the significant amount of funds involved, or any assignee have purchased an assignment, if it

---

**12.** The Debtor disputes that its obligation to contribute additional equity to the collateral is a pre-petition debt since its performance would occur post-petition. The Group Members, including the Banks, clearly had, however, a "right to payment," 11 U.S.C. § 101(4)(A), from Drexel on the filing of the petition even though payment was contingent on subsequent valuation of the collateral. Drexel's obligation is like that of a guarantor who, as of the date of the filing of a petition of the primary obligor, had not been called upon to honor his guarantee. His claim for reimbursement by the primary obligor is a contingent pre-petition claim. The obligation arises out of the debtor's pre-bankruptcy past. D.G. Baird & T.H. Jackson, *Cases, Problems and Materials on Bankruptcy* 144, 396 (1984). Drexel's obligation is also like the claim of a bank with respect to an open pre-petition letter of credit. Such a claim is a contingent pre-petition claim even though the claim did not become non-contingent and liquidated until the letter of credit was drawn upon post-petition. *In re Revere Copper & Brass Inc.*, 60 B.R. 887 (Bankr.S.D.N.Y.1985).

could be deprived of its ratable share by the whim or tyranny of a majority.

Section 7.2 of the Pledge Agreement, the very provision relied on by the Banks for the grant of such power, confirms that no such ability was intended. It enables the majority to instruct the Collateral Agent, but it exempts the Collateral Agent from following any instruction "contrary to this Agreement...."[13] An instruction not to distribute to each and every Group Member its ratable share would be directly contrary to sections 5.4 and 2.1. Collectively, those sections require distribution to each Group Member of its ratable share of net collateral proceeds.

In addition, the sharing provision, Credit Agreement § 2.13, indicates that it was never contemplated that a majority of the Group Members could give instructions requiring a freeze so that they could set off the ratable share owed a Lender or its assignee. Its requirement that a Group Member, who received sums in excess of its ratable share through setoff, purchase participations from all other Group Members not receiving the excess is completely inconsistent with any contemplation of setoff of a distribution to a Group Member. By the terms of that provision, every Group Member who by setoff received an excess share would have to purchase forthwith a participation in the loan of the Group Member whose distribution had been set off in the amount of the excess received. The circular nature of the requirement belies any notion of setoff of a distribution to a Lender or a Group Member having the rights of a Lender.

### (i)

Despite the clear intent of these provisions, the Banks assert that they are obligated as principal to Drexel because the Collateral Agent acts only as agent. To this they add that they, a majority, are obliged, as principals, to make distribution to Drexel of its ratable share of the proceeds of the collateral since, in their view, section 9.03 of the Credit Agreement bars all suits against the Collateral Agent for following the instructions of the Banks.

In arguing that agency law allows them to instruct the Collateral Agent to withhold distribution of Drexel's pro rata share, the Banks conveniently disregard section 7.2 of the Pledge Agreement which exempts the Collateral Agent from following instructions which violate that agreement. Since an instruction to the Collateral Agent to withhold a distribution to a Group Member such as Banque Worms or Drexel would violate the Pledge Agreement, the Collateral Agent is not subject to control by a majority of the Group Members when acting as distributor of the proceeds.

The "mere use of the word 'agent' by parties in their contract cannot be held to have the effect of making one an agent who, in fact, is not such." 3 Am.Jur.2d Agency § 21 (1986). Thus, "[e]ven though a person is termed an agent, he may, in fact, act as such in some matters but not in others." *Pan Am. World Airways, Inc. v. Shulman Transport Enter., Inc. (In re Shulman Transport Enter., Inc.),* 744 F.2d 293, 295, 12 Bankr.Ct.Dec. 779, Bankr. L.Rep. (CCH) ¶ 70138 (2d Cir.1984). *See also Rose v. Giamatti,* 721 F.Supp. 906, 919 (S.D.Ohio 1989) (while Commissioner of Baseball is authorized to act as agent on behalf of Major League Baseball, Commissioner was not agent in disciplinary matters because he is not subject to control in that area); W. Sell, *Agency* § 1 (1975) (the names given by the parties to their relations is not dispositive).

Accordingly, even though one may be an agent for some purposes, if an al-

---

**13.** The degree of this protection can be seen, moreover, from the clause's exclusion of the Collateral Agent's reasonable belief from that part of the proviso referring to instructions violating the Pledge Agreement. The proviso states: "... provided, however, that the Collateral Agent shall not be required to take any action [which the Collateral Agent reasonably believes exposes the Collateral Agent to personal liability or] which is contrary to this Agreement or applicable law." Pledge Agreement § 7.2 (brackets inserted). As insertion of the brackets shows, in separating the two clauses beginning with "which" from each other, the reference to the Collateral Agent's belief is only to its personal liability, not to violation of the Pledge Agreement.

leged agent's acts concerning a certain subject matter cannot be controlled and directed by the principal, there is no agency relationship with regard to that subject matter. *Shulman*, 744 F.2d at 295; *Maritime Ventures Int'l, Inc. v. Caribbean Trading & Fidelity, Ltd.*, 689 F.Supp. 1340, 1353 (S.D.N.Y.1988), *reconsid. denied*, 722 F.Supp. 1032 (S.D.N.Y.1989) (control is essential element and critical indicator of agency relationship); *Morgan Guar. Trust Co. v. Republic of Palau*, 657 F.Supp. 1475, 1481 n. 2 (S.D.N.Y.1987); *In re Neptune World Wide Moving, Inc.*, 99 B.R. ·584, 588 (Bankr.S.D.N.Y.1989); *Restatement (Second) of Agency* § 1(1) comment b (1958). Illustrative is *Shulman*. There a freight forwarder arranging freight shipments for its customers received payments from shippers in the full amount of transportation charges from which it would deduct its commission. A carrier claimed that the freight forwarder acted as its agent, not only in arranging shipment, but also in collecting funds and, therefore, the funds belonged to it as its contract provided. In holding that no agency relationship existed with respect to the funds, the court ruled: "Absent the critical element of control [the carrier] over [the freight forwarder's] collection and handling of funds, [the freight forwarder] cannot be said to have acted as [the carrier's] agent for the receipt of transportation charges." 744 F.2d at 295 (citations omitted).

Here, there is also "[a]bsent the critical element of control," *id.*, by a majority of the Group Members over the distribution of shares of each of the Group Members, including Drexel. By expressly excusing Bankers Trust from obeying any instruction effectively depriving a Group Member of its pro rata share, the parties to the Pledge Agreement preserved, by failing to provide for control of the Group Members over distribution, the right of all Group Members to receive their pro rata shares. Thus, although the Collateral Agent is an agent for all the Group Members in collection and realization of the collateral, it is not an agent for purposes of distribution and the Banks are not principals in that respect.

Section 9.03 of the Credit Agreement, relied upon by the Banks, is not to the contrary. That section provides, in pertinent part:

> no Bank shall have any right of action whatsoever against the Collateral Agent as a result of the Collateral Agent acting or refraining from acting hereunder or under any Pledge Agreement in accordance with the instructions of the Majority Banks....

The exemption, *see* Pledge Agreement § 7.2, of instructions violating that agreement effectively limits section 9.03 to acts that do not violate the Pledge Agreement. In any event, section 9.03 hardly gives a majority of the Group Members control over distributions to be made by Bankers Trust.

### (ii)

Supporting the construction of these agreements as precluding a majority of Group Members from affecting a distribution to any one of them is the close analogue of the rights of a participating bank in a fund held by a lead or agent bank pursuant to a loan participation agreement.

Participants in a loan participation agreement, even where there is but one single promissory note held by the lead bank in its own name, are recognized as holding partial ownership interests, in the amount of their ratable shares, of a fund received by the lead bank as agent for all the participants, including itself, in collecting the loan.[14] *See Hibernia Nat'l Bank v. FDIC*, 733 F.2d 1403, 1408 (10th Cir. 1984); *FDIC v. Mademoiselle*, 379 F.2d 660, 665 (9th Cir.1967);[15] *Mason & Dixon*

---

14. A participation arrangement's creation of an ownership interest is further supported by 12 C.F.R. § 32.107 (1989), which excludes certain participated loans from the calculation of a bank's legal lending limit.

15. Both *Mademoiselle* and *Hibernia* allowed borrowers to offset previously established credits with lead bank against amounts owed under a participated loan. In *Mademoiselle*, the Ninth Circuit acknowledged with approbation the general rule that a loan participation passes legal

*Lines, Inc. v. First Nat'l Bank*, 86 B.R. 476, 478 (M.D.N.C.1988), *aff'd*, 883 F.2d 2 (4th Cir.1989) (a loan participation creates a partial ownership interest in the loan account to the participant); *Seattle–First Nat'l Bank v. FDIC*, 619 F.Supp. 1351, 1355 (W.D.Okla.1985); *Deutscher v. Tennesco, Inc. (In re Southern Indus. Banking Corp.)*, 45 B.R. 97, 100 (Bankr.E.D. Tenn.1984) (loan participants had direct ownership interests that lead bank must honor); Stahl, *Loan Participations: Lead Insolvency and Participants' Rights*, 94 Banking L.J. 882, 888 (1977). *See also Franklin v. Commissioner of Internal Revenue Serv.*, 683 F.2d 125, 129 (5th Cir. 1982); *Delatour v. Prudence Realization Corp.*, 167 F.2d 621, 624 (2d Cir.1948) (certificate holders were deemed the "real owners" of the mortgage and entitled to aliquot share); *In re Prudence Co.*, 89 F.2d 689, 692 (2d Cir.1937). *Cf. In re Fried Furniture Corp.*, 293 F.Supp. 92 (E.D.N.Y. 1968) (participant has lien on proceeds from sale of debtor's chattel), *aff'd mem.*, 407 F.2d 360 (2d Cir.1969).[16] The lead bank, by participating the loan, assigns, transfers, and conveys an undivided percentage ownership interest in the collateral for the participated loan to the participant. It holds the funds it collects by way of repayment of the loan for distribution to the participating banks according to their percentage ownership interest. Accordingly, the loan participants are entitled to their shares as beneficiaries of a trust. *See, e.g., Jefferson Sav. and Loan Ass'n v. Lifetime Sav. and Loan Ass'n*, 396 F.2d 21, 24 (9th Cir. 1968) (express trust found); *Stratford Financial Corp. v. Finex Corp. (In re Stratford Fin. Corp.)*, 367 F.2d 569, 571 (2d Cir.1966) (same); *Coffey v. Lawman*, 99 F.2d 245, 248 (6th Cir.1938) (same); I A. Scott & W. Fratcher, *The Law of Trusts* § 16 (4th ed.1987) [hereinafter cited as Scott and Fratcher] ("A partial assignee of a chose in action, like a beneficiary of a trust of a chose in action, has an equitable interest in the chose in action, and not merely a personal claim against the assignor. Thus the partial assignee prevails over the general creditors of the assignor. . . ."). If no express trust is found, courts will enforce the ownership interest through im-

title in the proceeds of the fund to the participants. 379 F.2d at 665. The lead bank is, therefore, a collecting agent for the lead banks and the proceeds of the participated loans held by the lead bank are the property of the participants. *Id.* Under the facts before it, however, the Ninth Circuit allowed setoff by the borrower of amounts owed under a participated loan against credits maintained in a depository account with the insolvent lead bank principally because there was no creation of a specific fund to which the participants' property rights attached. *Id. Hibernia*, expressly following the Ninth Circuit's lead in *Mademoiselle*, also allowed the borrower to offset credits with the lead bank against debts due under the participated loan because the setoff was only a shifting of credits within the lead bank and did not create a specific fund. 733 F.2d at 1408. To the extent that *Hibernia* can be read to suggest that even a "typical" loan participation does not create a debtor-creditor relation between the participants and the borrower because no ownership interest is transferred, *id.* at 1407, the case runs afoul of *Mademoiselle*, the decision it follows in other respects, as well as the rulings of the Supreme Court and of the Second Circuit and other circuits. *See, e.g., Small Business Admin. v. McClellan*, 364 U.S. 446, 450, 81 S.Ct. 191, 194–95, 5 L.Ed.2d 200 (1960); *Jefferson Sav. and Loan Ass'n v. Lifetime Sav. and Loan Ass'n*, 396 F.2d 21, 24 (9th Cir.1968); *Stratford Fin. Corp. v. Finex Corp. (In re Stratford Fin. Corp.)*, 367 F.2d 569, 572 (2d Cir.1966); *Delatour v. Prudence Realization Corp.*, 167 F.2d 621, 624 (2d Cir.1948); *Todd v. Pettit (In re Elliott)*, 108 F.2d 139, 140 (5th Cir.1939); *In re Prudence Co.*, 89 F.2d 689, 692 (2d Cir.1937); *In re Westover Inc.*, 82 F.2d 177, 181 (2d Cir.1936); *In re Fried Furniture Corp.*, 293 F.Supp. 92 (E.D.N.Y.1968), *aff'd mem.*, 407 F.2d 360 (2d Cir.1969).

16. As to this general rule there is little debate. Rather, the dispute concerns whether a participant also receives an ownership or trust beneficiary interest in the loan itself enabling it to share in a repayment of the loan that is not the result of collection proceeds, but is occasioned by the borrower's setoff of amounts owed under the loan against credits with the lead bank. *Compare Hibernia* and *Mademoiselle* (setoff of deposit held mere shifting of credits within lead bank and did not create a fund for participants) *with* Anderson, *Loan Participations and the Borrower's Bankruptcy*, 64 Am.Bankr.L.J. 39, 51 (1990) *and* MacDonald, *Loan Participations as Enforceable Property Rights in Bankruptcy—Reply to the Trustee's Attack*, 53 Am.Bankr.L.J. 35, 40–41 (1979) (participant has ownership or trust interest in loan, not just collections).

position of a constructive trust.[17] *See* Scott and Fratcher, *supra* § 16; MacDonald, *Loan Participations as Enforceable Property Rights in Bankruptcy—A Reply to the Trustee's Attack*, 53 Am. Bankr.L.J. 35, 66 (1979).

The relationship is not that of debtor and creditor. *Small Business Admin. v. McClellan*, 364 U.S. 446, 450, 81 S.Ct. 191, 194–95, 5 L.Ed.2d 200 (1960); [18] *In re Prudence Co.*, 89 F.2d 689, 692 (2d Cir. 1937); *In re Westover, Inc.*, 82 F.2d 177, 181 (2d Cir.1936); MacDonald, *Loan Participations*, 53 Am.Bankr.L.J. at 47. *See also* Scott and Fratcher, *supra* § 12 (a claim based upon an interest in specific property is not a debtor-creditor relationship). In cases where the lead bank is an agent of the participating banks, the lead bank is an "agent-trustee" if it receives title to the funds or a bailee, who holds the funds in trust without the attendant fiduciary responsibilities, if it does not have title but mere possession of the funds. *Restatement (Second) of Trusts* § 12 comment (h)

(1959). Acting as a collection agent, the lead bank is "not a debtor of the principal, unless the principal manifested an intention that the agent should be entitled to use the money as his own." *Id.*

In this case, where separate notes are involved and the collecting agent has no right to the funds, it is even more certain that a right to distribution of a pro rata share of collateral proceeds is not the product of a debtor-creditor relationship absent a contrary provision in the documentation.[19] The provisions of these agreements requiring that each Group Member receive its pro rata share and those provisions regarding individual advances, notes and even potentially different interest rates, which make each Group Member a direct creditor of First DBL in an amount evidenced by an individual promissory note, underscore that this agreement far exceeds the usual single note joint loan nature of loan participation agreements.[20] They strongly indicate that the right to receive a ratable distributive share is, therefore,

---

**17.** The Banks, while denying a general fiduciary duty to Drexel, Final Brief, pp. 7–8, assert that the Lenders have a fiduciary obligation to distribute to Drexel its pro rata share of collateral proceeds. Banks' Supp.Br., p. 14 n. 8. The Banks thus apparently recognize that Drexel, as Group Member, has either a direct ownership or a beneficial interest in its ratable share of the proceeds.

Section 9.01 of the Credit Agreement states that: "[t]he Collateral Agent shall not have by reason of this Agreement or any Pledge Agreement a fiduciary relationship in respect of the Borrower or any Bank or any other Person." The Banks do not cite this provision, presumably for the reason that failure to create an express trust does not prevent a court from imposing the remedy of a constructive trust. *United States v. Marx*, 844 F.2d 1303, 1308 (7th Cir.1988) (a constructive trust is a remedial device which arises by operation of law to prevent unjust enrichment); *Rosenberg v. Collins*, 624 F.2d 659, 663 (5th Cir.1980) (an express trust requires intention to create it, whereas a constructive trust may be created regardless of the intent of the parties where equity and justice demand); *Bell v. Straight, Inc.*, 707 F.Supp. 325, 328 (S.D.Ohio 1989) (constructive trust may be imposed by court regardless of intent of parties to create express trust); *United States v. Fontana*, 528 F.Supp. 137, 143 (S.D.N.Y.1981) (a "constructive trust is not intended but is treated as if it were intended").

**18.** *McClellan* concerned a bank loan in which the SBA was a three-quarters participant. The

issue before the court was whether the SBA, which had joined a private bank in a loan participation in which the borrower subsequently went bankrupt, was entitled to a priority in the borrower's estate for "debts due the United States." 364 U.S. at 447, 81 S.Ct. at 193. If the loan participation had created a mere debtor-creditor relationship between the lead bank and the participant, the SBA would not have been a creditor of the borrower and could not have claimed a priority in the borrower's assets. The Court held that "beneficial ownership" of seventy-five percent of the borrower's debt belonged to the SBA from the inception of the participation. *Id.* at 450, 81 S.Ct. at 194–95. The Court's holding is based on the notion that the sale of the participation conveyed a partial ownership interest.

**19.** *See In re Yale Express Sys., Inc.*, 245 F.Supp. 790, 792 (S.D.N.Y.1965) (loan documentation provided for entire interest to belong to lead bank and lead bank retained sole discretion regarding the pursuit of any default remedies).

**20.** *See, e.g., In re Westover, Inc.*, 82 F.2d 177, 181 (2d Cir.1936) (certificate holders in a participation issued in a single mortgage rather than a group issue were held to have purchased a partial undivided ownership interest in the mortgage and were therefore not creditors of the lead bank).

more clearly not due to a debtor-creditor relationship. It is thus concluded that each Group Member has a similar ownership interest in the fund of collateral· proceeds rather than a creditor/debtor relationship with either the Collateral Agent or any of the other Group Members.

█ Such an ownership interest invokes another agency principle: when two or more persons give authority to an agent, it is presumed that the agent's authority covers only actions relating to their joint matters. *Restatement (Second) of Agency* § 41(1) (1958), *see also*, F. Reynolds, *Bowstead on Agency* Art. 12 (15th ed.1985) ("where two or more persons give authority to an agent, the presumption is that they are authorizing him to act only in such matters as concern them jointly, *e.g.*, their joint property, and not in matters concerning one or the other alone").

By permitting a majority of the Group Members to instruct the Collateral Agent with regard to liquidation of the collateral but not as to distribution of the collateral proceeds, section 7.2 of the Pledge Agreement accords with that presumption. A joint agency was created in the Collateral Agent for purposes of collecting and liquidating collateral, matters which inherently affect the property of the Group Lenders as a unit. No agency, however, was created for distribution of pro rata shares in which the Group Members own distinct, undivided property interests. As section 7.2 itself states by exempting instructions that violate the Pledge Agreement, the Collateral Agent, when acting as distributor of the collection proceeds, is not an agent controlled by a majority. Its duty in distribution is simply to deliver each pro rata share to the respective individual Group Members.

In sum, the Credit and Pledge Agreements are appropriately construed, consistent with their terms, to require the Collateral Agent to distribute pro rata shares of the collateral proceeds to each Group Member. The Collateral Agent is not an agent of the majority for distribution purposes. Nor is a majority of the Group Members a principal in that respect. The Collateral Agent is exempted from following any instructions that would violate these agreements and the Pledge Agreement requires ratable distribution to all Group Members, including Drexel. The sharing provision also indicates that such a setoff could not have been intended since Drexel is conceded to have all of the rights of a Lender. Any amount obtained by the Banks through setoff; even pursuant to section 3.06 of the Credit Agreement which permits setoffs against Drexel, would, by virtue of the sharing provision, have to be returned to Drexel in the form of purchasing participations in Drexel's position.

The Banks repeatedly assert that they are entitled to the rights they bargained for. In construing such obviously heavily negotiated agreements setting forth interbank relationships, "it is hornbook law that the parties to agreements are presumed to have intended just what their agreements set forth." *In re Yale Express Sys.*, 245 F.Supp. 790, 793 (S.D.N.Y.1965). Careful analysis of these agreements reveals that they neither bargained for nor obtained the rights they now seek.

## B

█ Presumably because of these fairly straight-forward provisions, the Banks, in their supplemental briefs, apparently change their theory regarding their alleged obligation. They assert that "if the ... Banks instructed the Collateral Agent to withhold Drexel's pro-rata share of the collateral proceeds, Drexel's only cause of action would be against the ... Banks." Banks' Supp.Br., p. 13. To this they add that "[b]ecause Drexel has a cause of action against the ... Banks, it has a right to payment from them, and thus a claim against them," *Id.* n. 7. The claim they would offset arises only if the instruction were given. What the Banks seek here is that the automatic stay be modified to permit them to give the instruction.

No case of which we are aware, however, has held that the automatic stay is to be modified or vacated to permit a creditor to commit an act which, by that act, will make the creditor obligated to a debtor and then

to use that act as a ground for setoff. The Banks have not cited any cases permitting such an egregious result.

Were the Banks allowed to give the instruction now that Drexel has filed for bankruptcy, it would create a post-petition claim by Drexel as debtor-in-possession against them. Section 553(a), however, limits setoff to pre-petition debts and claims. A post-petition claim by a debtor-in-possession is not mutual with a pre-petition debt owed by a non-debtor. *E.g. Cooper–Jarrett, Inc. v. Central Transp., Inc.*, 726 F.2d 93, 96 (3d Cir.1984).

Nevertheless, the Banks, citing *Elcona Homes*, 863 F.2d 483, claim that mutuality exists. There, the debtor, a manufacturer of mobile homes, sold a mobile home through a dealer pre-petition. A finance company financed the purchase by paying a net purchase price of $22,700 in exchange for an assignment of the installment contract entered into between the purchaser and dealer. The dealer was to remit to the debtor the amount paid by the finance company. The parties had developed a practice whereby the finance company would pay that sum directly to the debtor. The finance company failed to do so prior to the filing of the debtor's petition and sought to set off an amount owed it by the debtor with respect to an earlier transaction. The bankruptcy court held there was no mutuality since the finance company was not contractually obligated to the debtor. The district court reversed, finding such a debt in the practice of the parties. In reversing the district court, the Seventh Circuit ruled that "there can be no set off unless the $22,700 was in fact a debt owed by [the finance company] to [the debtor]," 863 F.2d at 487, and that a practice does not an obligation make. *Ibid.* The court remanded for further evidence to determine if, under the arrangement the debtor could have sued the finance company absent bankruptcy for the $22,700.

Here according to the Banks, Banks' Supp.Br., p. 14 n. 8, Drexel could sue the Banks if it instructed Bankers Trust to withhold the collateral. That instruction not yet having been given, the suit could only be brought post-petition. The setoff sought thus does not fall within section 553. That section permits setoff of only mutual pre-petition debts and obligations.

■■■■■■ In addition, it is clear under recent authoritative case law that a freeze of payments to a debtor-in-possession or trustee may not be unilaterally ordered by a creditor without court approval, at least in cases not involving bank deposits.[21] The

**21.** The Banks have taken inconsistent positions on whether the giving of instructions to the Collateral Agent to withhold Drexel's distributive share would violate the automatic stay. *See* n. 6, *supra.* In their Final Brief, p. 2, they contend that there would be no violation, citing *Air Atlanta Inc. v. National Bank of Georgia*, 81 B.R. 724 (N.D.Ga.), *aff'g*, 74 B.R. 426 (Bankr.N.D.Ga.1987).

The bankruptcy courts have sharply divided over the issue of whether a bank creditor with which a debtor in bankruptcy has a deposit may unilaterally effect an "administrative freeze" or "hold" on the debtor's deposit account and defer all payments from that account without violating the automatic stay. *Compare, In re Edgins*, 36 B.R. 480, 11 Bankr.Ct.Dec. 585, Bankr.L.Rep. (CCH) ¶ 69762 (Bankr.App. 9th Cir.1984); *Air Atlanta Inc.*, 74 B.R. at 426; *In re Williams*, 61 B.R. 567 (Bankr.N.D.Tex.1986); *In re Gazelle*, 17 B.R. 617 (Bankr.W.D.Wisc.1982); *Kenney's Franchise Corp. v. Central Fidelity Bank*, 22 B.R. 747, 9 Bankr.Ct.Dec. 675 (W.D.Va.1982) *and In re Carpenter*, 14 B.R. 405, 8 Bankr.Ct.Dec. 168, Bankr.L.Rep. (CCH) ¶ 68396 (Bankr.M.D.Tenn. 1981) (no violation since freeze did not consti-

tute a charging of debtor's account, bank is a secured creditor and debtor may not, pursuant to § 363(c), use cash collateral, and § 542 may permit bank to hold funds in response to demand for turnover) *with Cusanno v. Fidelity Bank*, 29 B.R. 810, 10 Bankr.Ct.Dec. 793, Bankr. L.Rep. (CCH) ¶ 69309 (E.D.Pa.1983), *vacated mem.*, 734 F.2d 3 (3d Cir.1984) *and In re Wildcat Constr. Co.*, 57 B.R. 981 (Bankr.D.Vt.1986) (freeze violates § 362(a)(3) in that it is an exercise of possession or control over property of the estate). As these cases demonstrate, the question of whether a debtor-in-possession may draw on a general checking account post-petition when it owes a bank pursuant to a loan raises significant issues.

In contrast, the cases involving an administrative freeze in a non-bank deposit setting uniformly hold that the unilateral retention of a debtor's funds is violative of the automatic stay. *Small Business Admin. v. Rinehart*, 887 F.2d 165, 19 Bankr.Ct.Dec. 1508, Bankr.L.Rep. (CCH) ¶ 73125 (8th Cir.1989); *United States v. Reynolds*, 764 F.2d 1004, Bankr.L.Rep. (CCH) ¶ 70599 (4th Cir.1985); *United States v. Norton*, 717 F.2d 767, 10 Bankr.Ct.Dec. 1337, Bankr.L.Rep. (CCH)

bankruptcy courts should not, therefore, modify the automatic stay to permit a freeze unless there is a pre-existing right of set off. It would be anomalous indeed if the automatic stay, designed to protect debtors and creditors alike by protecting the property of the estate, should be modified to permit acts by creditors in order to create allegedly mutual obligations. It is one thing to recognize pre-existing rights; it is another highly inequitable thing to permit the creation of new creditor rights post-petition through modification of the automatic stay.

## IV

Not only have the Banks failed to demonstrate that they could set off the ratable share of the collateral proceeds to be distributed to Drexel as against Drexel's obligation; they have also failed to demonstrate that, even were their interpretation of the Credit Agreement accepted, the set-off they seek would be permitted by section 553 of the Bankruptcy Code. The Banks do not address the issue of mutuality directly. They baldly assert that mutuality is not destroyed by the Lenders' fiduciary obligation to share the collateral proceeds. Banks' Supp.Br., p. 14 n. 8. They further contend that mutuality should be excused. To this they add that they, as third party beneficiaries of Drexel's obligation to make additional investments in First DBL, may assert First DBL's right to setoff that obligation against First DBL's debt to Drexel as Group Member.

Each of these arguments is without merit. Under either their theory that they owe Drexel its ratable share or their theory that they could create the obligation, mutuality is missing. If, as they postulate, it is they who are to distribute to Drexel its ratable share, they may not set off that share against Drexel's obligations to repay advances and provide additional collateral. Similarly, even were they to be permitted to create an obligation to Drexel on their part by instructing Bankers Trust to withhold distribution to Drexel, that obligation, admittedly a fiduciary obligation, may not be set off as against Drexel's obligations to them individually. Mutuality is required by the language of section 553. Furthermore, the Banks' theory that they could assert an alleged direct obligation to First DBL is makeweight.

### A

#### (i)

The concept of "mutual debts," contained in section 553 of the Code, generally requires that "the debts must be in the same right and between the same parties, standing in the same capacity." 4 R. D'Agostino, M. Cook, R. Mabey, A. Pedlar, B. Zaretsky, *Collier on Bankruptcy* ¶ 553.04[2] (15th ed. 1989) (citations omitted). If a creditor's debt to his debtor arises from a fiduciary duty or in the nature of a trust, the creditor may not set off his claim against the debtor against his own liability because the parties are acting in different capacities and the debts of each side are not mutual. *Libby v. Hopkins,* 104 U.S. 303, 26 L.Ed. 769 (1881); *In re Esgro, Inc. (Toys "R" Us, Inc. v. Esgro, Inc.),* 645 F.2d 794, 8 Bankr.Ct.Dec. 227, Bankr.L.Rep. (CCH) ¶ 68320 (9th Cir.1981); *United States v. Roth,* 164 F.2d 575 (2d Cir.1948); *Allegaert v. Perot,* 466 F.Supp.

¶ 69367 (3d Cir.1983). The *Rinehart* court, in holding that the retention violated § 362(a)(3), reasoned that, whether or not it constituted a setoff under § 362(a)(7), it surely constituted an act to exercise control over property of the estate in violation of § 362(a)(3). The court stated that the SBA was not without recourse to protect its interests. It pointed out that bank deposit cases are different in that the SBA did not face the potential liability under § 542(c) for post-petition transfers to third parties with notice or knowledge of the commencement of the case that banks holding deposits encounter. These cases also enjoy statutory support since the 1984 amendment to tighten up § 362(a)(3) by barring the exercise of control over estate property.

Section 553 exempts from its permission of set-offs any act in violation of § 362(a).

The instant case is not a bank deposit case. Here the Banks similarly face no potential liability for transfers to third parties. Thus, the giving of instructions to Bankers Trust as Collateral Agent to withhold Drexel's distributive share would violate the automatic stay for it would be an exercise of control over estate property.

516, 5 Bankr.Ct.Dec. 197 (S.D.N.Y.1978); *Morris v. Windsor Trust Co.*, 213 N.Y. 27, 106 N.E. 753 (1914); 4 *Collier* ¶ 553.04[2].[22] "To permit ... setoff of a claim in the fiduciary's own right is at war with the fundamental principle that a fiduciary may never deal for his own profit with the subject matter of his trust." *Morris*, 213 N.Y. at 32, 106 N.E. at 755. No authority supports a finding of mutuality here where the Banks characterize their obligation to share proceeds with Drexel as a fiduciary obligation and seek to set off that obligation against Drexel's debt to them in their individual capacities.

### (ii)

■ Moreover, the requisite mutuality is not satisfied because the Banks do not "owe" Drexel even under their theory. *See Libby*, 104 U.S. at 309; *Cohen v. Savings Bldg. & Loan Co. (In re Bevill, Bresler & Shulman Asset Management Corp.)*, 896 F.2d 54, 57 (3d Cir.1990); *In re Lykens Hosiery Mills, Inc.*, 141 F.Supp. 891, 893–94 (S.D.N.Y.1956); *Brust v. Sturr*, 128 F.Supp. 188, 190 (S.D.N.Y.1955), *aff'd in relevant part*, 237 F.2d 135 (2d Cir.1956); *In re Autler*, 23 F.Supp. 756, 756 (S.D.N.Y 1938); 4 *Collier* ¶ 553.04[1]. As observed above, Drexel has, not merely a claim, but an ownership interest in the collateral proceeds. The Banks, being in possession of Drexel's pro rata share of the collateral proceeds as bailee or constructive trustee, without color of lien, do not owe a mutual debt to Drexel, because title to the property does not lie in the Banks, but in the estate. *Libby*, 104 U.S. at 309; *Bevill*, 896 F.2d at 57–58; *In re Bob Richards Chrys-*

*ler–Plymouth Corp.*, 473 F.2d 262, 265 (9th Cir.), *cert. denied*, 412 U.S. 919, 93 S.Ct. 2735, 37 L.Ed.2d 145 (1973); *Lykens*, 141 F.Supp. at 894; *Autler*, 23 F.Supp. at 756.

In the seminal trust case, *Libby*, 104 U.S. 303, A.T. Stewart & Co. loaned Lewis Hopkins $100,000 in consideration for Hopkins' promissory note and mortgages on real property. Hopkins also owed Stewart & Co. as a result of drawing on his account at Stewart & Co. to pay his suppliers. Prior to filing for bankruptcy, Hopkins remitted payments in the sum of $58,025 to Stewart & Co., with express instructions that they be applied to his $100,000 note. Instead of doing so, Stewart & Co. applied the payments to Hopkins' account. In its post-petition suit, brought in Ohio state court, Stewart & Co. was found to have wrongfully applied the $58,025 payments to the account and ordered to pay Hopkins' trustee $58,025 with interest.

The Supreme Court affirmed, reasoning that by remitting the payments to Stewart & Co., to be applied in accordance with his instructions, Hopkins did not intend to make the company his debtor, but his trustee. Stewart & Co. could not, by applying the funds entrusted to it for application to the mortgage loan for an entirely different purpose, create a debt upon which to base setoff, and thereby better his condition by refusing to execute the trust. There being no mutual debt contemplated by the parties, setoff was not permitted.[23]

■ Closely analogous to the trust cases are such cases as *Autler* and its progeny.[24] In *Autler*, 23 F.Supp. 756, title

---

**22.** Because § 553 is derived from antecedents found in former bankruptcy acts, with changes intended to restrict the right of setoff and to treat its exercise as a preference under certain circumstances, cases defining "mutuality" under former bankruptcy acts are authoritative. 4 *Collier* ¶ 553.01[4]; H.R.Rep. No. 595, 95th Cong. 1st Sess. 377 (1977).

**23.** *See also Bevill*, 896 F.2d at 58 (where repurchase agreements provided that the debtor, a dealer in government securities, was to sell and repurchase Treasury Bonds and GNMA securities and that Treasury Bond coupon interest and GNMA principal and interest payments would

remain the property of the debtor, although in the possession of the buyer, the buyer was held to be a trustee holding the funds for the debtor, the true owner of the trust res, and did not have a mutual debt which could be offset); *Lehigh Valley Coal Sales Co. v. Maguire (In re Gilmore–Thayer Co.)*, 251 F. 581 (7th Cir.1918) (creditor who received payment from the bankrupt for a new order for coal could not apply the payment to the balance due by the bankrupt on its open account, because the creditor was not a debtor of the bankrupt, but the trustee of the payment).

**24.** In juxtaposing those cases in which a constructive trust was imposed with those in which

to meters that the bankrupt installed on real property lay in the bankrupt and the owner had no lien on them. Sued by the trustee for recovery of the meters, the owner attempted to set off the value of the meters against its claim for monies owed it by the bankrupt for failing to pay for electric current furnished. The district court did not address whether the owner was entrusted with the meters, but held, following *Libby,* that a creditor, when sued for return of the debtor's property or for its value, will not be allowed to set off its claim against the debtor. Since the meters were the debtor's property and the owner held no lien on them, the owner did not "owe" the debtor any debt. There was thus no mutual debt to set off.[25]

In re Allbrand Appliance and Television Co., Inc., 16 B.R. 10, 8 Bankr.Ct. Dec. 660, Bankr.L.Rep. (CCH) ¶ 68486 (Bankr.S.D.N.Y.1980) and *In re W. & A. Bacon Co.,* 261 F. 109 (D.Mass.1919), the sole cases cited by the Banks on this point, are hardly to the contrary. At issue in *Allbrand* and *Bacon* was whether a debtor and its C.O.D. collection agent had a debtor-creditor relationship enabling the agent to set off its bill for shipping services against collections or whether the debtor had an ownership interest in the collections. Both courts permitted the setoff. In ruling that the relationship was that of debtor-creditor, the courts noted that the debtors made no claim that the collections were to be kept separate from the agent's general funds, 16 B.R. at 13, 261 F. at 110, and the *Bacon* court added that "[t]here

was nothing which expressly or impliedly bound the claimants to return the collections in specie." 261 F. at 110. They, therefore, followed the rule that the mere receipt of funds by an agent, without more, will not establish a trust relationship or that the principal has an ownership interest. 16 B.R. at 14; 261 F. at 114.

*Allbrand* and *Bacon* are consistent with those cases ruling that a critical, although not conclusive, factor distinguishing an ownership interest in funds from a debtor creditor relationship is whether the possessor of the funds could commingle the funds with its general funds. *E.g., Shulman,* 744 F.2d at 295–96; *Stratford,* 367 F.2d at 571; *In re Warner–Quinlan Co.,* 86 F.2d 103, 104 (2d Cir.1936); *In re Penn Central,* 392 F.Supp. 960, 962 (E.D.Pa.1975). Other factors are whether the recipient: (i) had executed a note to pay the amount received, *Stratford,* 367 F.2d at 571, (ii) agreed to pay interest, *Penn Central,* 392 F.Supp. at 962, (iii) agreed to pay the funds as received or periodically out of its general funds, *Shulman,* 744 F.2d at 296; *Warner,* 86 F.2d at 104; *Allbrand,* 16 B.R. 10, (iv) was restricted as to use of the funds, *Shulman,* 744 F.2d at 295, (v) could resort to the funds for its own purposes when in need, *Stratford,* 367 F.2d at 571, (vi) held funds which could be reached by its general or secured creditors, *Shulman,* and (vii) held the funds for services rendered to a third party by the party claiming an ownership interest in the funds, *Penn Central,* 392 F.Supp. at 963. *See generally* Scott and Fratcher, *supra* § 12.2.[26]

a bailment was apparently found, we note that none of these cases has addressed why one was found as opposed to the other. We need not, however, for purposes of setoff, determine whether Drexel's ratable share is held by the Collateral Agent or Banks as bailee or constructive trustee. In neither case is the debt mutual with Drexel's obligation to the Banks.

**25.** *See also Brust,* 128 F.Supp. 188, (where the Collector of Internal Revenue seized assets of a bankrupt pursuant to three warrants of distraint which were satisfied by the property seized, the Collector could not set off the surplus from the sale of the seized assets against its unsecured claim against the bankrupt's estate for additional taxes due since, the Collector having adventitiously come into possession of the surplus by

asserting its rights as a secured creditor which did not entitle it to more than was necessary to satisfy its warrants, the trustee's claim against the Collector was not a debt); *Lykens,* 141 F.Supp. 891 (where the debtor had delivered the yarn to a processor, expressly retaining title, with instructions that the latter knit the yarn only upon further instruction by the debtor, the court held that the processor could not retain the yarn and set off its value against its claim against the debtor, if it were established that the processor held the debtor's yarn as a mere bailee, for title would lie, not in the processor, but in the bankruptcy estate).

**26.** *See also Half Moon Fruit & Produce Co. v. Floyd,* 60 F.2d 799 (9th Cir.1932) (where a partnership consignee customarily retained all the

Application of these factors shows clearly that Drexel has an ownership interest in its ratable share and that its relationship with Bankers Trust, or the Banks if their theory were accepted, concerning its ratable share is not a debtor-creditor relationship. There is no note from Bankers Trust or the Banks to Drexel; no interest is payable on the fund by the Banks or Bankers Trust to any Group Member; there is no claim by the Banks that they or Bankers Trust could commingle undistributed collateral proceeds with other funds; and there is no claim that Bankers Trust could pay each Group Member its pro rata share out of its general funds. In addition, no allegation is made that Bankers Trust has any right to dip into the net ratable shares of Group Members, after payment of its costs and expenses as agent, as though it had a beneficial interest therein. The Banks also make no claim that the creditors of Bankers Trust could have a claim against the collateral proceeds or that their own general creditors could have a claim against the ratable shares owed any of the other Group Members, including Drexel.

Thus, even were the Banks correct in their interpretation of the Credit Agreement and Pledge Agreement to make them responsible for distribution of Drexel's share, there could be no setoff. That responsibility is not mutual with Drexel's obligation to them in their individual capacities.

**B**

■ Apparently because of the firmness of the rules barring setoff of debts and claims owed and held in different capacities and setoff of claims versus property interests, the Banks assert that the mutuality requirement of section 553 should be disregarded. They assert that to require mutuality would be unjust because they "have reason to believe that Drexel and [Drexel Burnham Lambert, Inc.] concealed the declining value of the high yield securities held by PT Corporation." Banks' Supp.Br., p. 22; Duke Supp.Aff. ¶ 7.

In stating this "belief," the Banks observe that section 6.01(g) of the Credit Agreement requires that Bankers Trust provide them with two market value quotations by investment advisors for each security in the PT Corporation portfolio so that the Banks could determine whether its value had slipped below 110% of outstanding advances, thereby triggering Drexel's obligation to make an additional investment. One set of quotations was furnished by Drexel Burnham Lambert, Inc. ("Drexel Burnham"), Drexel's broker dealer subsidiary; another set of quotations was furnished by one of the investment advisors to PT Corporation. Duke Supp.Aff. ¶ 6. Those advisors are wholly independent of Drexel and Drexel Burnham. Duke Supp. Aff. ¶¶ 2–3. Apparently these reports, only one of which was prepared by Drexel

net proceeds of the consigned produce to apply to indebtedness owed by the consignor, except at the beginning of each season when the bankrupt's expenses were heavy in which case the partnership would remit the proceeds from sale of the produce, "... such goods constitute a mutual credit given by the bankrupt to the other, and when they are sold, the avails may be set off against any unsecured claims due from the bankrupt." 60 F.2d at 802). The Banks do not claim that an analogous course of conduct exists in the instant case.

Nor is it claimed that a debtor-creditor relationship is conferred by regulation. *See Interstate Record Distribs. v. Columbia Broadcasting Sys. (In re Interstate Record Distribs.),* 307 F.Supp. 1142 (S.D.N.Y.), *aff'd,* 430 F.2d 1017 (2d Cir.1970) (statute repealing excise tax on phonograph records based on sales price to be passed from manufacturer to dealer and ultimately to consumers and treasury regulation implement-

ing that statute explicitly contemplated the alternative of a credit by the manufacturer against the dealer's debit balance).

Nor do the Banks claim that they hold the debtor's property in a segregated account with color of lien, evidencing a debtor-creditor relationship, and that they, therefore, can realize upon the lien. *See In re Pal–Playwell, Inc.,* 334 F.2d 389 (2d Cir.1964) (where state law and the agreement of the parties permitted a landlord to retain a lessee's deposit "as security for performance of the contract," and state law required that the deposit remain segregated and property of the lessee, the deposit was not held in trust for the benefit of the lessee, but was held by the landlord to apply whenever necessary to insure fulfillment of the lessee's contractual obligations). *See also Fore Improv. Corp. v. Selig,* 278 F.2d 143 (2d Cir.1960) (a commingling landlord forfeited its right to a security deposit upon the lessee's bankruptcy).

Burnham and none of which was prepared by Drexel, showed PT Corporation portfolio values of $145,451,247 and $140,019,246 for January 31, 1990 and February 9, 1990 respectively. *Id.* at ¶ 7. No second report was obtained for $30 million of securities. *Id.* at ¶ 9. The Banks note that Drexel had acted as underwriter for many of these securities. *Id.* A subsequent report by Drexel Burnham, dated March 2, 1990, showed a value of $114,636,310, *id.* at ¶ 8, Exh. E—a decrease of 19% from February 9, 1990. To this the Banks add that at least $11 million is invested in defaulted securities.

Since the Banks do not claim that Drexel or Drexel Burnham was responsible for determining the composition of the PT Corporation portfolio or served as its investment advisor, these allegations are reduced to a "belief" of concealment inferred on the basis of having failed to obtain the independent second report and a 19% decrease in the market value of the PT Corporation portfolio after Drexel filed for bankruptcy on February 13, 1990 and Drexel Burnham concurrently announced that it was winding up its business. Duke himself, however, has characterized the junk bond market as currently unstable. Duke Aff. ¶ 7. That instability, on this record, can just as easily be attributed in part to the fall of Drexel and Drexel Burnham and Duke does not specify what percentage decline is solely attributable to Drexel's alleged concealment. The $26 million decline in portfolio value, on this record, could particularly be attributed to Drexel's fall since it acted as underwriter for many of the securities composing the $30 million for which an independent opinion was not obtained. Perhaps it is for these reasons that the Banks fail to advance this "belief" in concealment as a claim against Drexel that they could set off.

■■■ These suppositions afford no warrant for failing to enforce the mutuality requirement that Congress mandated in section 553. It is to be highly doubted that that requirement could be so excused. Mutuality was required by section 68 of the former Bankruptcy Act since its enactment in 1898. 11 U.S.C. § 108 (1976) repealed; 4 J. Moore, R. Oglebay, F. Kennedy, L. King, *Collier on Bankruptcy* ¶ 68.04 (14th Ed. 1978 & Supp.1982). It was expressly continued in section 553(a) of the Bankruptcy Code. Just as "[w]hen Congress makes wholesale changes in the text and structure of the law, it is fatuous to pretend that a silent legislative history means that existing practices should continue unchanged," *Levit v. Ingersoll Rand Fin. Corp.*, 874 F.2d 1186, 1196 (7th Cir.1989), when Congress makes no change in the text of law, it is nonsensical to pretend that tacit legislative history means existing legal requirements are to be discarded. *Midlantic*, 474 U.S. at 501, 106 S.Ct. at 759–60, 88 L.Ed.2d at 865–66.

*Modern Settings, Inc. v. Prudential–Bache Securities*, 109 B.R. 605 (S.D.N.Y. 1989), offers no support for excusing mutuality where to do so would adversely affect general creditors by diminishing a bankruptcy estate. There, the debtor had a claim for negligent misrepresentation and breach of fiduciary duty with respect to a margin account. The defendant had a consignment claim against the debtor for return of 1500 oz. of gold. Key to the case is that prior to the bankruptcy the debtor had assigned its claim against the defendant to affiliated entities. 109 B.R. at 606, 608. In allowing the defendant to set off the claim of the affiliated entities obtained by assignment as against its debt to the debtor, the court held that there would be no prejudice to creditors and, therefore, mutuality could be excused. It ruled:

> Modern Settings, the bankrupt, is owed and controlled by the same shareholders as [the assignee] and the former has assigned its claim against [defendant] to the latter. ... In my view, therefore, the Bankruptcy Code's concern with providing a preference to creditors of the *bankrupt* is far less relevant here since, if set off is allowed [the defendant's] recovery will be from the judgment assigned to [the assignee affiliates].... For the same reasons, the defendant will not be unfairly benefitted.

109 B.R. at 608 (emphasis in original). In *Modern Settings*, the estate was not dimin-

ished since the debtor's claim had been assigned. The creditors were benefitted by the reduction of claims against the estate through the setoff by a creditor against a non-bankrupt entity. Similarly, the individual creditor was not unfairly benefitted. Here, in contrast, failure to enforce the mutuality requirement would adversely affect the general creditors by enabling one set of creditors to receive more than others. Only if pre-petition debts and claims are mutual did Congress so provide.

To not enforce the mutuality requirement here would, moreover, enable one set of creditors to dismember the estate by taking property that is owned by a debtor rather than merely offsetting a debt owed to a debtor. No case cited by the Banks or that we have been able to find permits that result. Completely inapplicable are *In re Sherman Plastering Corp.*, 346 F.2d 492 (2d Cir.1965) and *Beecher v. Peter A. Vogt Mfg. Co.*, 227 N.Y. 468, 125 N.E. 831 (1920), cited by the Banks. In *Sherman Plastering* the court held that one of three joint sureties could set off an indemnification claim owed by a debtor to it since the "debts are owed and owned by the same party, acting in the same capacity." 346 F.2d at 493. The debts were thus mutual but for the maxim that a singly owed debt cannot be off set against a joint obligation. The court held that the maxim does not apply to a pro-rata share of a joint debt owed by a surety in the same capacity as a single debt owed to it. 346 F.2d at 493, 496–97. Today, that maxim is of limited vitality. *See* 2 *Collier* ¶ 553.04[4]. *Beecher* held that a setoff of opposing judgments will not defeat the lien of the attorneys who produced the judgment. Rather than dismiss mutuality as the Banks would have us do here, Judge Cardozo reaffirmed the requirement, stating: "Debts, to be applied against each other must be mutual.... To be mutual, they must be due to and from the same persons in the same capacity.... Equity relaxes these rules, and goes beyond the law, only when the departure is necessary 'to prevent wrong and injustice' " 227 N.Y. at 473, 125 N.E. 831. (citations omitted).

In the instant case, even were the statutory requirement of mutuality to be disregarded as the Banks claim, on this record "is no case of wrong and injustice triumphant if a set-off be refused." *Beecher*, 227 N.Y. at 473, 125 N.E. 831. The "belief" they have in Drexel's having concealed the declining market value of the PT Corporation portfolio rests on the mere inference of 19% decline in a market that the Banks themselves characterize as unstable, can be explained by Drexel's fall into bankruptcy, and is unsupported by any allegation of acts of this debtor. To the extent, moreover, that the Banks claim surprise, that surprise appears to be at least partially attributable to the failure to obtain a second quotation concerning some $30 million of securities. The Banks having "reason to believe" is no ground on which to dismiss the requirement that a party seeking to set off have debts owed to and by it in the same capacity.

### C

■ Also without merit is the Banks' argument that they can cause First DBL to set off the payments from the collateral proceeds it would make to Drexel as Group Member as against Drexel's obligation. They thus hope to cure the absence of any obligation they have to Drexel.

The obligation to distribute the proceeds of the collateral belongs, however, to the Collateral Agent, not First DBL. Pledge Agreement §§ 5.4, 2.1. Indeed, these agreements are structured to keep the collateral out of First DBL's hands. Delivery of the PT Corporation stock certificates to the Collateral Agent is a condition to a Lender's making an advance, Credit Agreement § 4.02(b), and the additional equity investments are to be deposited directly with the Collateral Agent, Credit Agreement § 6.01(h).

### V

In addition to setoff, the Banks claim a right to Drexel's share under its sibling doctrine, recoupment. That doctrine, nevertheless, is of no assistance to them here: they are not obligated to Drexel.

■ Recoupment is "[t]he setting up of a demand arising from the same transaction as the plaintiff's claim or cause of action strictly for the purpose of abatement or reduction of such claim...." 4 *Collier* ¶ 553.03 at 553–13 (15th ed. 1989). It arose as a equitable rule of joinder to avoid the bringing of two separate actions in the law and equity courts concerning the same transaction. Recoupment permits a party, to assert as a defense, in an amount equal to the amount claimed by the opposing party, a claim arising from the same transaction as that giving rise to the cause of action of the moving party. *E.g., In re B & L Oil Co.*, 782 F.2d 155, 157, 14 Bankr. Ct.Dec. 133 (10th Cir.1986); J. Moore, Moore's Federal Practice ¶ 13.02, at 13–13 n. 1 (2d ed. 1987).

■ Since the Credit Agreement and Pledge Agreement, properly construed, provide that distribution to a Group Member such as Drexel is to be made by Bankers Trust, and the Banks' arguments that they act as principals with respect to distribution cannot be sustained, the Banks have no obligation to set off. The same provisions in the agreements precluding setoff also bar recoupment. There is no obligation to recoup. In addition, whatever doctrine is employed, it is contrary to these agreements that any Group Member be distributed less than its ratable share as provided in § 2.1 of the Pledge Agreement.

If the Banks were correct in their construction of these agreements, the recoupment theory they advance would be of no assistance to them here. The Banks assert recoupment in order to avoid the notion that a pre-petition claim of a creditor may not be set off against the post-petition claim of a debtor under those cases that have permitted set off under a recoupment theory. *See* H. Buschman, *Benefits and Burdens: Post–Petition Performance of Unassumed Executory Contracts*, 5 Bankr.Dev.J. 341, 355–57 (1988) [hereinafter cited as *Benefits*].

■ As applicable here, the Banks' recoupment argument relates only to their claims that, were they to instruct the Collateral Agent to withhold Drexel's ratable share and Bankers Trust were cavalier enough to follow the instruction, Drexel would have a claim against them which they could set off.[27] Even were the automatic stay to be modified to permit the creation of this post-petition obligation, *see* Part III B, *supra*, however, recoupment would not lie.

No case cited by the Banks or that we have been able to find permits recoupment by one setting up its own breach of fiduciary duty, as the Banks characterize the claim that Drexel would have against them,[28] in order to net out obligations owed to them in their individual capacities. The debts are not mutual, as noted above, for reasons unrelated to whether the creditor's claim is pre-petition and its obligation is post-petition.

Furthermore, to permit recoupment would award those who act inequitably by effectively appropriating another's property for themselves. Recoupment is not to be permitted in such circumstances. *In re American Sunlake Ltd. Partnership*, 109 B.R. 727 (Bankr.W.D.Mich.1989). In *American Sunlake*, the court denied a creditor's attempted use of recoupment or setoff to reduce the amount of the liability it owed to the debtor. The creditor had breached a contract with the debtor for the repurchase of real estate. In defense of paying a judgment awarding damages for the breach, the creditor sought to recoup funds which it had overpaid to a mortgagee on the debtor's behalf. In holding that the creditor's inequitable conduct precluded it from requesting the equitable remedies of recoupment or setoff, the court stated:

---

**27.** The recoupment argument does not relate to the Banks' incorrect theory that they are obligated as principal because that theory posits a pre-petition obligation and they urge recoupment in order to net out a to-be-created post-petition obligation against Drexel's pre-petition debt to them.

**28.** It is assumed, but not decided, that the Banks' breach of its fiduciary duty if permitted to seize Drexel's share and Drexel's debt as obligor arise from the same transaction.

Inasmuch as the maxim 'he who comes into equity must come with clean hands' applies, [the creditor] cannot use the judgment owed to the Debtor resulting from its own misdeeds to seek to utilize the equitable doctrine or recoupment.

'This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.' *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945). To allow [the creditor] to recoup the judgment owed to the Debtor against the amount it has paid to [the mortgagee] would be to unjustly and inequitably regard [the creditor] to the detriment of the Debtor's ability to reorganize in this case.

109 B.R. at 731. The same maxim precludes the Banks from utilizing their own prospective fiduciary liability to recoup here. Taking property belonging to a debtor-in-possession and then setting up the obligation to return it as a basis for recoupment offends equity and is not to be permitted.

Moreover, what the Banks theorize here is foreign to the doctrine of recoupment. At common law, recoupment was "purely defensive in character and could be used only to defeat or diminish plaintiff's recovery; recoupment could not be the basis for affirmative relief." 6 C. Wright & A. Miller, Federal Practice and Procedure § 1401 (1971 & Supp.1983). "In the absence of a statute to the contrary, recoupment is purely defensive, or in the nature of a common-law defense, and not a separate cause of action or a weapon of offense." 20 Am. Jur.2d *Counterclaim, Recoupment, and Setoff* § 6 (1965) (citations omitted). *Accord e.g.*, *Lee v. Schweiker*, 739 F.2d 870, 875 (3rd Cir.1984); *Schroeder v. Prince Charles, Inc.*, 427 S.W.2d 414, 419 (Mo.

1968). Here the Banks seek affirmative relief to create a cause of action so that, if the collateral is insufficient to pay them, they can take the further affirmative step of netting out the obligation they would create against the amount owed by Drexel.

*B & L Oil* and *In re Fiero Production, Inc.*, 102 B.R. 581 (Bankr.W.D.Tex.1989), relied on by the Banks, are inapposite. In both cases, suppliers mistakenly overcredited a debtor pre-petition and sought to recoup the overpayment from their contractual obligation to make further sales. In *B & L Oil*, the court granted a declaratory judgment allowing recoupment if the debtor continued to make purchases pursuant to the contract. In *Fiero*, the court did the same and awarded an additional sum on a counterclaim.[29] Neither of these cases effectively permitted recoupment in the affirmative manner sought here.

■ Although the Banks' recoupment argument adds nothing for the reasons stated above, it is also of no merit because, in permitting the netting out of their pre-petition claims against a post-petition obligation, it effectively accords their pre-petition claims the status of administrative claims. The severe constraints of the Bankruptcy Code and its legislative history on employing recoupment in such circumstances is a topic we have addressed elsewhere. *See Benefits, supra* at 349–58. Briefly, the Code sharply differentiates pre-petition claims from post petition claims. Post-petition claims are allowable under § 503(b) and paid as a first priority under § 507(a) if the claimant proves that (i) the debt arose from a post-petition transaction with the debtor-in-possession, (not from a pre-petition transaction with the debtor), or that the claimant gave consideration to the debtor-in-possession and (ii) the transaction directly and substantially benefitted the estate. *E.g.*, *Employee Transfer Corp. v. Grigsby (In re White Motor Corp.)*, 831 F.2d 106, 110, Bankr.L.Rep. ¶ 72026 (6th Cir.1987); *Cramer v. Mam-*

---

**29.** This line of cases has been criticized for going too far on several grounds, including the failure to follow the Supreme Court's ruling in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), that an unassumed executory contract may not be enforced against a debtor. *See Benefits, supra* at 355–57.

*moth Mart, Inc. (In re Mammoth Mart, Inc.),* 536 F.2d 950, 954 (1st Cir.1976). If allowed, the claim is to be paid in full and in cash on confirmation of a plan of reorganization unless the parties agree otherwise. 11 U.S.C. § 1129(a)(9)(A).

In several respects, the Code prevents elevation of a pre-petition claims to post-petition status or its equivalent. For instance, section 552 limits the post-petition effect of a pre-petition security interest. Section 553(a), as noted above, requires that setoff be limited to mutual pre-petition debts and obligations. As the Second Circuit has forcefully stated:

> Congress granted priority to administrative expenses in order to facilitate the efforts of the trustee or debtor in possession to rehabilitate the business for the benefit of all of the estate's creditors.... Congress reasoned that unless the debts incurred by the debtor in possession could be given priority over the debts which forced the estate into bankruptcy in the first place, persons would not do business with the debtor in possession, which would inhibit rehabilitation of the business and thus harm the creditors.

*Trustees of the Amalgamated Ins. Fund v. McFarlins, Inc.,* 789 F.2d 98, 101 (2d Cir.1986) (citations omitted).

On the one occasion Congress considered netting out pre-petition and post-petition claims and obligations, it rejected that notion with respect to the interline balances owing by railroads to one another and the consequent payment of certain pre-petition claims in full when others receive less "as violative of the principle [of] equal treatment of all creditors under Title 11." 124 Cong.Rec. 34,008 (Oct. 5, 1978) (Statement of Sen. DiConcini), 32,409 (Sept. 28, 1978) (Statement of Rep. Edwards). *See Union Pac. R.R. Co. v. Moritz (In re Iowa R.R.),* 840 F.2d 535, 538 (7th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 244, 102 L.Ed.2d 233 (1988).

The cases recognizing such recoupment under the Code fail to address these limitations and the legislative history. The early cases mistakenly interpreted a statement from a treatise to reason that recoupment was permitted and erroneously relied on pre-Code case law that did not involve netting out pre-petition claims and post-petition obligations.[30] *Benefits, supra* at 351–52. By permitting recoupment, the courts were attempting to do equity in cases where a supplier had overpaid a debtor pre-petition even though they made no finding that the overpayment could be traced. *Benefits, supra* at 356–57. In so ruling, however, most of the courts, *see e.g. Fiero Production,* 102 B.R. 581, focus on only the equity between the debtor and the overpaying creditor who is required to render further performance post-petition of an unassumed executory contract. They ignore that permitting recoupment of a pre-petition claim as against a post-petition obligation primes all other unsecured creditors. *Benefits, supra* at 357.

Here, there is no further performance to be rendered. The Banks do not claim that the Credit and Pledge Agreements are executory in nature. The Banks, unlike the

---

**30.** In *Quittner v. Los Angeles Steel Casting Co.,* 202 F.2d 814 (9th Cir.1953), the court refused to permit recoupment on the ground to do so would effectively grant a preference "and prevent the other creditors from obtaining a fair and ratable distribution of the debtor's assets." 202 F.2d at 817. *Weinburg v. Knights of Columbus (In re Sherman),* 627 F.2d 594, 6 Bankr.Ct. Dec. 872, Bankr.L.Rep. ¶ 67497 (2d Cir.1980), is sometimes cited as allowing recoupment under the former Bankruptcy Act. The court, however, made no reference to the doctrine. The trustee sued on a pre-petition employment agreement to collect commissions that accrued post-petition. Insurance law permitted the employer to deduct previously advanced excess commissions from future commissions and the court held that the trustee was entitled only to the net sum. There was no post-petition performance by the debtor. The commissions had been earned pre-petition and the trustee's claim to them was thus a pre-petition claim. A similar case under the former Bankruptcy Act is *Waldschmidt v. CBS, Inc.,* 14 B.R. 309 (Bankr.M.D.Tenn.1981). There, the trustee sued to collect royalties due pursuant to a pre-petition contract, but which accrued post-petition. The court held that the right to the royalties is property of the estate and the defendant could recoup, as against the pre-petition obligation, the pre-petition advances paid to the debtor. None of these cases involved recoupment of pre-petition claims against post-petition obligations.

suppliers in *B & L Oil* and *Fiero*, will not be called upon to sell additional goods to a debtor-in-possession.[31] In this case where the debtor is liquidating its business, all that recoupment would achieve is to elevate the Banks' pre-petition claim thereby priming other creditors. To be sure, section 553 permits a limited inequality by permitting set off of pre-petition claims and obligations. The Bankruptcy Code, however, offers no warrant for recoupment of a pre-petition obligation, especially in a case like this where no further extension of credit or provision of goods or services is sought from a creditor.

Finally, the Banks claim that this case is closely analogous to *In re Heafitz*, 85 B.R. 274 (Bankr.S.D.N.Y.1988). *Heafitz* was an action brought by the trustee for a bankrupt partner against a partnership for turnover of his share of partnership profits. The debtor had defaulted on notes evidencing his contributions to the partnership. The contract was assumed, thereby requiring cure of all defaults. See 11 U.S.C. § 365(b). The debtor's obligation thus became a post-petition obligation. The contract provided that a partner's distributive share would be paid by the partnership only to the extent the share exceeded unpaid principal and interest on the notes. The court followed the contract, allowing recoupment since the share was less than the amount owed.

Here, the contracts do not provide for only a net payment. Drexel's share is to be distributed to it by Bankers Trust, set off and recoupment of a Group Member's ratable share are inconsistent with the applicable agreements, and any instruction by the Banks to withhold the share would be to instruct Bankers Trust to violate the Pledge Agreement rather than abide by its terms.

For the foregoing reasons the Banks' motion must be denied. Cause is not to be excused. The Banks have not demonstrated a legally cognizable right to set off or recoup that should be protected by modifying the automatic stay to permit the retention of Drexel's ratable share of collateral proceeds.

Settle order.

---

**31.** Nor are the Banks in the position of the creditor in *Rakozy v. Reiman Constr. (In re Clowards, Inc.)*, 42 B.R. 627 (Bankr.D.Idaho 1984) which they cite. There, the court apparently thought that it was presented with a recoupment case with respect to an executory contract. The debtor, however, had assumed the contract post-petition, thereby creating an administrative liability for failure of future performance. *Benefits* at 342, 355 n. 75. Thus, its subsequent default resulted in a post-petition claim of the creditor.